IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| REGINALD BLACK, | ) | CASE NO.  1:20-cv-00183 |
|  | ) |  |
| Plaintiff, | ) | MAGISTRATE JUDGE |
|  | ) | KATHLEEN B. BURKE |
| v. | ) |  |
|  | ) |  |
| COMMISSIONER OF SOCIAL | ) |  |
| SECURITY, | ) |  |
|  | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) |  |

Plaintiff Reginald Black ("Plaintiff" or "Black") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 12.   For the reasons explained herein, the Court **AFFIRMS** the Commissioner's decision.

## I.  Procedural History

*Prior Application*

Prior to filing the social security application that is the subject of the pending appeal, Black filed an application, which resulted in an unfavorable decision by an ALJ dated February 22, 2013.  Tr. 215-237, 273.  The Appeals Council denied Black's request for review of that decision on May 20, 2014, making the ALJ's February 22, 2013, the final decision.  Tr. 238-243.

*Current Application*

On June 30, 2014, Black filed an application for supplemental security income ("SSI"). Tr. 273, 470-475.  He alleged disability beginning on May 21, 2014.  Tr. 13, 273, 470.  Black alleged disability due to apnea, bipolar disorder, depression, diabetes, disc problems, obesity, high blood pressure, lymphedema, spinal condition, migraines, acid reflux, allergies, hepatitis C, and brain and spinal cord problems.  Tr. 245-246, 259, 326, 333.

After initial denial by the state agency (Tr. 326-328) and denial upon reconsideration (Tr. 333-334), Black requested a hearing (Tr. 335-337).  On March 21, 2016, a hearing was held before an Administrative Law Judge ("ALJ").  Tr. 159-214.  On April 5, 2016, the ALJ issued an unfavorable decision, (Tr. 270-289), finding that Black had not been under a disability within the meaning of the Social Security Act since June 30, 2014, the date the application was filed (Tr. 274, 285).  Black requested review of the ALJ's April 5, 2016, decision by the Appeals Council. Tr. 371.  On June 6, 2017, the Appeals Council remanded the case to an ALJ for further explanation regarding the ALJ's decision as it related to findings in the prior 2013 ALJ decision; further consideration of Black's past work; and, if warranted, to obtain supplemental evidence from a vocational expert.  Tr. 290-294.

On remand, on January 10, 2018, a hearing was held before an ALJ.  Tr. 95-158.  On February 8, 2018, the ALJ issued an unfavorable decision (Tr. 295-318), finding Black had not been under a disability within the meaning of the Social Security Act since June 30, 2014, the date the application was filed (Tr. 300, 312).  Black requested review of the ALJ's February 8, 2018, decision by the Appeals Council.  Tr. 410-411.  On June 12, 2018, the Appeals Council remanded the case to an ALJ for further analysis regarding whether Black's past work as a

computer operator met the requirements for past relevant work; to obtain additional evidence regarding Black's impairments and, if warranted, to obtain supplemental evidence from a vocational expert.  Tr. 319-323.

On remand, on December 12, 2018, another hearing was held before an ALJ.  Tr. 34-94. On February 28, 2019, the ALJ issued an unfavorable decision (Tr. 9-33), finding Black had not been under a disability within the meaning of the Social Security Act since June 30, 2014, the date the application was filed (Tr. 14, 26).  Black requested review of the ALJ's February 28, 2019, decision by the Appeals Council.  Tr. 467-469.  On December 31, 2019, the Appeals Council denied Black's request for review, making the ALJ's February 28, 2019, decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.    Personal, vocational and educational evidence

Black was born in 1965.  Tr. 25.  He was 49 years old at the time his application was filed and 53 years old at the time of the December 12, 2018, hearing.  Tr. 25, 41.  Black received an associate's degree of arts and an associate's degree of science with a specialty in engineering. Tr. 42.  At the time of the December 12, 2018, hearing, Black was taking online courses, pursuing a Bachelor of Science in healthcare management.  Tr. 47-51.  Black anticipated completing his education in April 2020.  Tr. 51.  Black's past work included work as an automotive parts stocker; data entry which involved scheduling classes for groups (services scheduler); file clerk; packing and shipping clerk; and quality control inspector.  Tr.  55-75, 82-84.

### B.    Medical evidence

#### 1.  Treatment history

*Physical impairments*

In 2009, Black was in a motor vehicle accident.  Tr. 695.  He was hit by a truck and was treated at the emergency room for acute back pain multiple times and had physical therapy for his ankle and back pain in 2013 at MetroHealth Medical Center ("Metro").  Tr. 695.  Black also treated with Dr. Mary Vargo, M.D., at the Pain Medicine and Rehabilitation (PM&R) clinic at Metro for his back pain.  During a June 19, 2014, follow-up visit with Dr. Vargo for back pain, Dr. Vargo noted that comorbidities included diabetes mellitus[1] with neuropathy, hypertension, GERD, sleep apnea, bipolar disorder, hepatitis C, and history of migraines.[2]  Tr. 694.  Black's pain was "in his low back, to the paraspinals bilaterally, and down his legs to his feet like needles, to bottom and top of feet."  *Id.*  Black reported that he had been walking more (sometimes 2-3 miles each day) but, as he walked, his back pain and the radiating pain worsened and he was not always sure he would be able to make it back home.  Tr. 694.  Black was taking Mobic and Neurontin which were helping.  *Id.*  The swelling in Black's legs was greater on the right than left.  *Id.*  They were working on getting authorization for compression stockings. *Id.* Black was going to be starting physical therapy and he was working with weight management. *Id.* Dr. Vargo noted that an October 4, 2013, lumbar MRI showed epidural lipomatosis at the L5 level and in the sacral spinal canal and mild degenerative changes with facet hypertrophy.  Tr. 695.  On physical examination, Dr. Vargo noted that Black was alert, obese, he was tender in the midline at the lower lumbar spine and B lumbar paraspinals; straight leg raise was negative; he had full range of motion in his lumbar spine; his sensation was intact to light touch; his

---

[1] Black saw various physicians in the endocrinology department at Metro, including Drs. Hussain, Kahn, and Calles-Escandon, for treatment of his diabetes mellitus.  *See e.g.*, Tr. 1278-1282, 1537-1546, 3695.

[2] As discussed herein, Black treated with weight management regarding his obesity.  Also, he was treated for lower extremity lymphedema.

coordination was grossly intact; he had trace reflexes bilaterally; and his gait was intact. Tr. 697. Dr. Vargo's impression was chronic low back pain with history of radiating pain into the bilateral lower extremities. *Id.* She recommended epidural steroid injections at the L5 level; continuation of Neurontin and Mobic and increasing physical activity; compression stockings (once authorization obtained); and physical therapy for the swelling in his legs. Tr. 698.

Black had epidural steroid injections at the L5 level in July 2014 (Tr. 1103) and, when Black saw Dr. Vargo in October 2014, he reported excellent results, indicating he no longer had bilateral lower extremity radiating symptoms, only axial low back pain (Tr. 1170). As of his October 2, 2014, visit with Dr. Vargo, Black had received physical therapy for his lymphedema and had received his compression stockings. Tr. 1170. Dr. Vargo noted that, per physical therapy, Black's gait and function had improved, although he was continuing to use a straight cane. *Id.* Black reported that he had a few transient instances when he was not able to move his legs, with his back hurting at those times. *Id.* Dr. Vargo's impression was chronic low back pain with history of radiating pain into the bilateral lower extremities, epidural lipomatosis, and facet arthropathy per MRI, and additional issues of obesity, diabetes mellitus, neuropathy, and lymphedema. Tr. 1174. Dr. Vargo noted that, since his last visit, Black was progressing well. *Id*. She recommended that Black continue to take Neurontin and Mobic; continue with the stockings, wrapping and home exercises for his lymphedema; and follow up with her in January at which time they would plan for a physical therapy referral for Black's back. *Id.*

Black saw Dr. Vargo on January 6, 2015. Tr. 1448. He was continuing to have low back pain with some (not every day) radiation into his legs and toes. *Id.* Black reported that his pain was worse with prolonged standing or walking and sitting for 30 minutes. *Id.* He ambulated with a straight cane. *Id.* He was interested in physical therapy but not interested in another

injection at that time because he was "coping relatively well" notwithstanding some radiating symptoms. Tr. 1449, 1452. Black's weight was down. Tr. 1449. He weighed 326 pounds and was working with weight management. *Id.* On physical examination, there was tenderness at the midline of lower spine and the lumbar paraspinals; straight leg raise was negative; lumbar range of motion was full; coordination was grossly intact; and sensation and gait were intact. Tr. 1452. Dr. Vargo continued to feel that Black was progressing well and her diagnoses remained unchanged. *Id.* Dr. Vargo placed an order for physical therapy for a low back program and continued his medications. Tr. 1453.

Black started physical therapy for his low back pain in January 2015. Tr. 1467. During his second physical therapy session on January 20, 2015, Black was interested in trying a TENS unit. *Id.* Black was able to heel and toe walk without difficultly. Tr. 1468. With the exception of his abdominal muscles, Black's muscle strength was 5/5. *Id.* Black received treatment with the TENS unit and was provided a unit for use at home. Tr. 1468, 1469. Black was independent with self care and his activities of daily living. Tr. 1468. His gait was independent with a straight cane but slow and with decreased trunk rotation. Tr. 1469. Black continued with physical therapy through March 2, 2015, attending 10 sessions. Tr. 1560. At his tenth session, Black's reported pain level was a 2/10. *Id.* He reported that the TENS unit was really helping with his low back pain. *Id.* Black indicated that he was not having a lot of swelling; he was wearing his compression stockings daily and using multi-layer compression every night. *Id.* Black's gait was independent with a straight cane but slow and with decreased trunk rotation. Tr. 1561. He reported he could not sweep or mop but he had been vacuuming. *Id.* Black had partially met his goals and no further physical therapy was indicated at that time. Tr. 1562. Black was instructed to continue with home exercises, use of the TENS unit, and use of

compression stockings.  *Id.*  If his condition worsened, Black was instructed to return to his doctor.  *Id.*

During an April 13, 2015, follow-up visit with Dr. Vargo, Black relayed that he had recently been treated in the ER for cellulitis.  Tr. 1593.  Also, he had broken his left toe and was wearing an orthopedic sandal.  *Id.*  Since having broken his toe, he had not been keeping up with his lymphedema regimen, i.e., wraps and stocking.  *Id.*  Black's weight was down to 315 pounds. Tr. 1592.  Black reported relief from use of the TENS unit and Neurontin.  Tr. 1593.  Black was also continuing to take Mobic.  *Id.*   On physical examination, Black had tenderness in the midline of the lumbar spine and lumbar paraspinals; negative straight leg raise; and full range of motion in the lumbar spine on flexion but he was mildly restricted on extension and with side bending.  Tr. 1596-1597.  Dr. Vargo's assessment as to Black's diagnoses was unchanged.  Tr. 1597.  Dr. Vargo recommended that Black continue his medications, TENS unit, weight loss, back stretches, and use of his stockings and wraps.  *Id.*

On May 4, 2015, Black saw a nurse practitioner in the vascular surgery department regarding his lower extremity edema.  Tr. 1626.  Black relayed that he used a cane for stability. *Id.*  Nurse Green recommended that Black resume use of compression when he was able to tolerate it.  Tr. 1630.  Black saw Nurse Green for follow up on June 15, 2015.  Tr. 1687.  Nurse Green noted no gross neuro deficit in the extremities; Black ambulated with a cane for stability; and his edema was greatly improved.  Tr. 1687.

Black had an epidural steroid injection at the L5-S1 level on July 21, 2015.  Tr. 1743. When Black saw Dr. Vargo on August 31, 2015, he reported his low back pain was a little better. Tr. 1867.  He was able to perform activities for longer periods.  *Id.*  He was using a straight cane for ambulation.  *Id.*  He reported having a few falls earlier in the year but none since using his

cane.  *Id.*  Black continued to work with weight management.  *Id.*  Black was still having problems with the left toe that he had broken.  Tr. 1868.  Dr. Vargo did not think that Black needed to have a repeat injection at the time.  Tr. 1872.  Dr. Vargo recommended that Black continue with his medication and TENS unit; use Lidocaine for his left toe and obtain an x-ray of the toe to see if it was fractured; continue weight loss effort; and resume use of compression stockings.  *Id.*

At a follow-up visit with Dr. Vargo on December 15, 2015, Black relayed that he had been having numbness and tingling in his right arm.  Tr. 2059.  His primary care physician had increased his Neurontin and ordered cervical physical therapy.  *Id.*  Both interventions had helped with the numbness and tingling.  *Id.*  The increase in Neurontin had also helped with his back pain.  *Id.*  Black's pain scale was a 3/10.  *Id.*  He was doing sit ups to stay more active and was hoping for bariatric surgery but needed to lose another 30 pounds.  *Id.*  Black was still using a cane and the TENS unit.  *Id.*  He was wearing his compression stockings daily but only wrapping his legs if he noticed swelling.  *Id.*  Dr. Vargo noted that Black was receiving care for bipolar disorder through Recovery Resources and was prescribed Depakote for the condition.  Tr. 2062.  She noted that his condition was stable.  *Id.*  On physical examination, Dr. Vargo observed a mild deformity and numbness in the fifth toe of the left foot; coordination was grossly intact; there were trace reflexes bilaterally; and his gait was intact.  Tr. 2062-2063.  Dr. Vargo's impression was that Black's back pain was stable.  Tr. 2063.  Black did have a fracture in his toe but the pain was improving.  *Id.*  Black thought there was a possible procedure through the vascular clinic to help with his lower extremity swelling.  *Id.*  Dr. Vargo planned to look into that.  *Id.*

Black saw Dr. Vargo on March 15, 2016. Tr. 3448. Since last seeing Dr. Vargo, Black was seen by vascular surgery. *Id.* The surgeon did not recommend vein ablation and recommended that Black follow up as needed. *Id.* Black's numbness and tingling had resolved with Neurontin. *Id.* However, his back pain had increased without radiation. *Id.* Black described his pain as constant, burning, and sharp. *Id.* He was using the TENS unit daily for up to three hours. *Id.* On physical examination, Black's coordination was grossly intact; reflexes were trace bilaterally; there was pain with palpation of the L5 paraspinals bilaterally; there was decreased lumbar range of motion; gait was non-antalgic; there was good heel to toe walk without foot drop; there was appropriate base width and stride length; and there was good heel walk, toe walk, and tandem walk. Tr. 3453. An order was previously placed for a lumbar injection and Dr. Vargo encouraged Black to get the injection scheduled. Tr. 3454. Dr. Vargo encouraged general physical fitness exercise especially once the lumbar injection kicked in. *Id.*

When Black saw Dr. Vargo on June 20, 2016, Black reported that his low back pain was an 8/10. Tr. 3672. After walking for half a block, Black indicated he had to lean on a pole. *Id.* He had pain in his feet as well which he felt was related to pain shooting down his legs but not in a clear radicular pattern. *Id.* Black's medication and the TENS unit helped but not entirely. Tr. 3673. Black had been scheduled for an epidural injection at the L5-S1 level earlier that year but it was cancelled by the hospital because a new authorization was required and there were issues rescheduling the injection. *Id.* Black was still benefitting from use of the compression stockings. *Id.* Black was awaiting bariatric surgery. *Id.* He had not been able to exercise because of his back pain. *Id.* Dr. Vargo noted that Black was receiving care for bipolar disorder through Recovery Resources and was prescribed Depakote for the condition. Tr. 3677. She noted that his condition was stable. *Id.* On physical examination, Dr. Vargo observed a mild deformity and

numbness in the fifth toe of the left foot; coordination was grossly intact; there were trace reflexes bilaterally; there was pain with palpation of the L5 paraspinals bilaterally; decreased lumbar spine range of motion in flexion and extension; his gait was slow.  *Id.*  Dr. Vargo's diagnoses remained the same.  *Id.*  She noted that Black's foot pain might be diabetic neuropathic pain.  *Id.*  Dr. Vargo noted that Black had responded well to his prior injection and she was working on authorization for an injection at L5-S1.  Tr. 3677-3678.

Black had another lumbar epidural injection at the L5-SI level on August 9, 2016.  Tr. 2462.  When Black saw Dr. Vargo on October 5, 2016, he reported excellent benefit from the injection.  Tr. 2582.  He rated his back pain as 8-9/10 at this prior visit and it was 2-3/10 at the October visit.  *Id.*  Black was scheduled for gastric sleeve surgery on October 10, 2016.  *Id.* Black planned to join the YMCA and start swimming.  *Id.*  He was continuing to use the TENS unit with benefit.  *Id.*  Dr. Vargo noted that Black's bipolar disorder remained stable.  Tr. 2586. On physical examination, Black's coordination was grossly intact; reflexes were trace bilaterally; his back was nontender with no signs of nerve root tension; there was decreased range of motion in the lumbar spine; and gait was within normal limits.  *Id.*

Black saw Dr. Vargo again on December 7, 2016.  Tr. 2684.  Black's bariatric surgery had been postponed.  *Id.*  He continued to report excellent benefit from the epidural injection.  *Id.* Black had not started swimming yet but he had been walking 2-3 miles each day.  *Id.*  Black was requesting new compression stockings.  *Id.*  He was continuing to use the TENS unit with benefit.  Tr. 2685.  Physical examination findings were similar to the findings from the prior visit.  Tr. 2689.  Dr. Vargo continued Black on the same course of treatment.  Tr. 2689-2690.

On May 8, 2017, Black reported that his right-sided low-back pain was getting worse. Tr. 2874.  He rated his pain 2-5/10 but was not interested in another injection at that time.  *Id.*

Black was taking Neurontin but he was not taking Mobic.  *Id.*  Black's examination findings were generally unchanged.  Tr. 2879.  However, there was mild paraspinal tenderness on the right but no signs of nerve root tension.  *Id.*  Dr. Vargo recommended that Black continue to take Neurontin, use the TENS unit, continue with weight loss efforts, and use the compression stockings.  *Id.*

During a June 7, 2017, visit with Dr. Vargo, Black reported that his low back pain had been relatively stable at a 2-3/10 but it worse that day; it was at a 4-5/10.  Tr. 3008.  He described his pain as radiating into his bilateral anterior thighs.  *Id.*  Black did not feel ready for an injection but he felt he might need one soon.  *Id.*  He was continuing to receive benefits from Neurontin and the TENS unit.  *Id.*  He was still wearing compression stockings and awaiting weight loss surgery.  *Id.*  On physical examination, Black's coordination was grossly intact; reflexes were trace bilaterally; there was mild right-sided paraspinal tenderness with no signs of nerve root tension; lumbar range of motion was decreased; and gait was within normal limits. Tr. 3013.  Dr. Vargo continued Black on the same course of treatment.  *Id.*

Black saw Dr. Vargo on September 11, 2017, after having had bariatric surgery in August.  Tr. 4025.  Black relayed he needed a form completed relative to his social security application.  *Id.*  Black rated his back pain as a 4/10 and indicated that his pain level was unchanged notwithstanding his weight loss.  *Id.*  Physical examination findings were similar to the findings from the prior visit.  Tr. 4029-4030.  Dr. Vargo completed Social Security Physical Capacity and Mental Capacity forms and noted they would be sent to Black's attorney.  Tr. 4030.

During his December 11, 2017, visit with Dr. Vargo, Black reported losing 90 pounds since his surgery.  Tr. 4477.  There was some improvement in his back pain.  *Id.*  His reported pain level was 2-3/10.  *Id.*  Black's legs were not as enlarged as in the past but Black still felt that

11

the compression stockings helped.  Tr. 4478.  He also continued to benefit from the TENS unit.
*Id.*  Dr. Vargo noted that Black's bipolar disorder was stable.  Tr. 4482.  On physical examination, Black's coordination was grossly intact; his reflexes were not retested; there was mild low lumbar midline tenderness with no signs of nerve root tension; there was excellent lumbar range of motion with flexion and some decreased lumbar range of motion with extension; and gait was within normal limits.  *Id.*  Dr. Vargo indicated that Black's back pain was unchanged and he was coping well.  *Id.*  Dr. Vargo reduced Black's Neurontin dosage.  Tr. 4483.

Black had MRIs of his lumbar spine and cervical spine on December 23, 2017, due to left-sided weakness and numbness.  Tr. 4406-4409.  No pathological findings were identified on the lumbar spine MRI.  Tr. 4406.  The cervical spine MRI showed mild cervical spondylosis from C4 through C7 most severe at C5-6 on the right.  Tr. 4409.

Black saw Dr. Vargo on April 4, 2018.  Tr. 4592.  He reported her had a stroke in December 2017.  *Id.*  He explained that he "didn't feel right[]" but did not seek care until the following day and was thereafter hospitalized.  *Id.*  Since then Black had been attending outpatient occupational and physical therapy for residual left hemiparesis.  *Id.*  Black reported significant ongoing improvement but continued to rely on a straight cane.  *Id.*  He sometimes had difficulty controlling his left knee.  *Id.*  He was able to communicate effectively but sometimes he felt that he was stuttering or having difficulty getting words out.  *Id.*  Black's weight was trending up.  Tr. 4592.  When he was in the hospital he was told he should be eating more than he had been.  *Id.*  He was aware he needed to work on getting his weight back down.  *Id.*  His legs were more swollen than they had been.  *Id.*  Black indicated his primary care physician was possibly going to start him on a diuretic.  *Id.*  Black's back pain was stable and under control with the decreased dosage of Neurontin.  *Id.*  His back pain was usually around a 2-3/10 with his

pain sometimes increasing with exertion.  *Id.*  Black was taking online classes and they were going well.  Tr. 4592.  He was taking one class at a time with each class lasting five weeks.  *Id.*  Dr. Vargo commented that a note to support an accommodation that occasionally allowed for more time due to Black's health issues had been provided in March.  *Id.*  Dr. Vargo noted that Black's bipolar disorder was stable.  Tr. 4597.  Dr. Vargo observed that Black's gait was within normal limits and he used a straight cane.  Tr. 4598.  His sensation was intact; his coordination was grossly intact; he had mild tenderness in the mid low lumbar midline with no signs of nerve foot tension; his flexion was excellent; and extension was to 20 degrees.  *Id.*  Dr. Vargo's diagnoses of chronic low back pain with history of radiating pain into the bilateral lower extremities, epidural lipomatosis and facet arthropathy per MRI remained.  *Id.*  She noted that the low back pain responded well to epidural injections at the L5 level.  *Id.*

When Black saw Dr. Vargo on August 13, 2018, Black was doing well with respect to his recovery from his stroke but he still had an occasional stutter, mild instability in his lower left extremity, and relied on a cane for balance.  Tr. 4745.  Black's weight was continuing to trend up even though he reported attention to diet and home exercise.  *Id.*  He was continuing to use the compression stockings.  *Id.*  Black was also continuing to benefit from use of the TENS unit for his low back pain.  *Id.*  His online classes were going well with the need for flexibility to take breaks at times due to pain.  *Id.*  On physical examination, Dr. Vargo observed slight left facial weakness and dysarthria but Black was 100% intelligible with a good rate/fluency.  Tr. 4750.  His coordination was grossly intact; reflexes were 0-trace bilaterally; there was mild low lumbar midline tenderness with no signs of nerve root tension; flexion was excellent; extension was to 25 degrees; and gait was slow with use of straight cane.  *Id.*  Dr. Vargo's recommendations included continuing with home exercises, weight loss, Neurontin, online classes, compression

stockings, and straight cane.  Tr. 4751.  Dr. Vargo noted that "Social security disability status continues to be medically appropriate and necessary."  *Id.*

Black had another epidural injection at the L5-S1 level on November 15, 2018.  Tr. 4927-4928.  At that appointment, it was note that Black had a normal gait without assistance.  Tr. 4927.

*Mental impairments*

Black was diagnosed with bipolar disorder in 2008 and started receiving treatment at Recovery Resources in September 2009.  Tr. 2375.  Black continued to receive treatment for his bipolar disorder at Recovery Resources through at least July 2018.  Tr. 4893.

In June 2014, Black was focused on maintaining his sobriety and felt he had a strong support system in his fiancée and church.  Tr. 2251, 2252.  It was noted that Black's moderate depression had improved over the past 10 months through the use of coping skills, sobriety, and good social support.  Tr. 599.  His mood had been good in that there were no significant periods of low mood.  *Id.*  Black was taking Depakote ER 1500 mg and felt that it really helped.  Tr. 600, 2249, 2252.

During a September 30, 2014, session, Black reported that his wife (who he was separated from for 20 years) had died the prior month.  Tr. 2272.  He rated his depression a 9-10 on a scale of 1-10 with 10 being the worst.  *Id.*  Black relayed that his depression had worsened because he was not able to go to school or work or get social security disability approved.  *Id.*  He noted that his level of depression was constantly changing.  *Id.*  He indicated his concentration was "[p]retty good but . . . not like it use to be."  *Id.*  Black denied high risk behaviors, rapid speech, or issues with anxiety.  *Id.*  He was working on a book entitled "Food for Thought" that his church was going to publish.  *Id.*  Black relayed that he enjoyed cooking,

14

stating he got energy from cooking.  *Id.*  Black had not been to church for a while because he could not tolerate sitting in the pews.  *Id.*  Black was continued on Depakote ER 1500 mg for mood stabilization.  Tr. 2274.

On November 26, 2014, Black was pleasant and engaged.  Tr. 2284.  He reported that overall he had been feeling good but he had been kind of weepy since his aunt had passed away. *Id.*  Black had a minor daughter but did not want to see her until he was in a position to provide for her financially.  *Id.*  Black rated his depression a 6 out of 10.  Tr. 2286.  He was not sleeping well at night.  *Id.*  His sleep was "turned around."  *Id.*  He was sleeping from 5 a.m. to 4-5 p.m. *Id.*  Black was continued on Depakote ER 1500 mg for mood stabilization.  Tr. 2288.

In May 2015, Black reported that his mood was "pretty good."  Tr. 2391.  His sleep was "pretty good" but his energy was "low."  *Id.*  Black relayed that being on Depakote had really helped him manage his anger.  *Id.*  Black had been babysitting a 5-month old grandson.  *Id.* Black used a cane for ambulation.  *Id.*  Black's Depakote ER 1500 mg was continued.  Tr. 2394.

In August 2015, Black relayed that his sleep and appetite were "good" and his energy was "pretty good."  Tr. 2386.  Black's grandson was in daycare now.  *Id.*  Black was unable to exercise because of his back and was looking for a pool to be able to swim in.  *Id.*  He was working on maintaining relationships with his children (two adult daughters and one minor daughter).  *Id.*  The assessment was that Black's bipolar disorder was well controlled with his current medication.  Tr. 2389.

During a session in December 2015, Black reported he had been depressed, crying and not sleeping but his mood had improved and his crying spells had decreased over the past several days.  Tr. 2374.  Black relayed that his uncle had recently passed away and that caused him to remember the deaths of other family members as well.  *Id.*  Black also had not sleeping well

because his CPAP machine had broken.  *Id.*  He recently received a new machine and his sleep had improved.  *Id.*  Black's Depakote ER dosage was increased to 1750 mg.  Tr. 2378.

On January 20, 2016, Black reported that he was great and the holidays were nice.  Tr. 2368.  Black was preparing for bariatric surgery.  *Id.*  He was going to have to meet with a psychologist at Metro to be cleared for surgery.  *Id.*  Black relayed that he really enjoyed the winter because he cooked, played video games and watched movies.  *Id.*  Black reported that his mood was good and his energy and sleep were great.  *Id.*  Since increasing his medication, Black reported feeling "so much better[.]"  *Id.*  The impression was that Black presented as "elevated, stating he 'loves feeling this way."  Tr. 2372.  Black reported increased energy and there had been changes in his sleep, with his reported sleep time being 10-12 at his last visit and 5-8 hours at the January visit.  *Id.*  Black's Depakote ER dosage was increased to 2000 mg.  Tr. *Id.*

During a March 2016 session, Black reported that he was depressed about not having completed his education to allow him to reach his goal of becoming a chemical engineer and he wanted to pursue the degree.  Tr. 2357.  Black relayed that his medication really worked – it stopped his depression and helped him think.  *Id.*  Black reported he was continuing to stay sober.  *Id.*  Black had energy but could not exercise because of his back.  *Id.*  He continued to express interest in swimming.  *Id.*  He was sleeping 8-10 hours.  *Id.*  He was attending bariatric surgery classes and weight management classes.  *Id.*  Black reported improvement in his blood glucose levels.  Tr. 2357-2358.  He was planning to cook for Easter, noting it was his one day to splurge on food.  Tr. 2358.  The impression was that Black was improving and he was stable.  Tr. 2361.  No changes were made to Black's Depakote ER dosage.  *Id.*

In June 2017, Black reported that there were times when he was "weepy, depressed" but that the rest of the time he felt "happy/stable."  Tr. 2308.  He was sleeping 10-12 hours without

disturbance.  *Id.*  Black relayed that he was still getting enjoyment out of things but felt he was entering a depressive state.  *Id.*  He helped take care of his fiancée's mother but otherwise was just lying on the couch, watching television.  *Id.*  Black was not interested in changes to his medication and reported that he felt that how he was feeling would pass.  *Id.*  The impression was that Black was relatively stable.  Tr. 2312.  No changes were made to Black's medication.  *Id.*

In March 2018, Black reported that he was doing fine and things were great.  Tr. 4430, 4449.  He had gone back to school for a bachelor's degree.  *Id.*  He was also assisting his daughter with her homework via video chat.  *Id.*  Black felt that returning to school was helping with his depression because he had a purpose.  Tr. 4449.  Black's Depakote dosage had been discontinued in August 2017 after his bariatric surgery but he ended up going to his primary care physician to increase it back to 2000 mg because he had been agitated and irritable at the time.  Tr. 4449, 4452.  Black's Depakote was continued at 2000 mg per day.  Tr. 4452.

In May 2018, Black reported that he was still enrolled in school and getting straight As.  Tr. 4461.  His niece had been shot and a cousin had died from a heart attack.  *Id.*  Those events caused him to feel depressed but he was still able to function.  *Id.*  He was sleeping 10-12 hours and his energy levels were pretty good.  *Id.*  He loved being on Depakote and did not want to change his medication.  *Id.*  He was preparing for Memorial Day and was planning a big feast for his fiancée and family members.  *Id.*  Black's medication was not changed.  Tr. 4464.

In July 2018, Black reported seeing his oldest daughter and grandson every week.  Tr. 4889.  He was attending church every week.  *Id.*  Things were going well.  *Id.*  The impression was that Black was relatively stable.  Tr. 4893.  Black's Depakote ER was continued at 2000 mg.  *Id.*

### 2. Opinion evidence

### *Treating providers*

Dr. Vargo – October 2, 2014

On October 2, 2014, Dr. Vargo completed a Cuyahoga County Job and Family Services Office of Child Support Services form wherein she indicated that Black had the following diagnoses – low back pain with epidural lipomatosis and degenerative changes with facet arthropathy, bilateral lower extremity lymphedema, and diabetes with neuropathy. Tr. 1367. Dr. Vargo indicated that Black was unable to work and he had been unable to do so since March 27, 2009. *Id.* She stated that Black was permanently disabled. *Id.*

Dr. Vargo – September 11, 2017 (physical)

On September 11, 2017, Dr. Vargo completed a Medical Source Statement: Patient's Physical Capacity. Tr. 3752-3753. Dr. Vargo opined that Black had the following limitations, which she indicated were supported by medical findings of lumbar degenerative changes and epidural lipomatosis: he could lift and/or carry 10 pounds occasionally and 5 pounds frequently; he could stand/walk for a total of 2-3 hours in an 8-hour workday and stand/walk without interruption for 15-30 minutes; he could sit for a total of 6 hours in an 8-hour workday and without interruption for 4 hours; he could not climb, balance (noting he used a cane), kneel (noting it aggravated his pain), and crawl (noting he could not get back up); and he could rarely stoop or crouch. Tr. 3752.

Dr. Vargo also opined that, because Black sometimes had back spasms that caused him to drop things, he was limited as follows: he could reach frequently; push/pull occasionally; perform fine manipulation frequently; and perform gross manipulation occasionally. Tr. 3753. Dr. Vargo opined that, due to Black's asthma and bronchitis, he had the following environmental

limitations: heights and pulmonary irritants.  *Id.*  Dr. Vargo indicated that Black had been prescribed a cane, TENS unit, and CPAP machine.  *Id.*  Dr. Vargo opined that Black would need to alternate positions between sitting, standing and walking at will.  *Id.*  She indicated that Black experienced moderate pain and his pain would interfere with his concentration; cause him to be off task; and cause absenteeism.  *Id.*  Dr. Vargo opined that Black would need to be able to elevate his legs at will at 90 degrees, noting that Black had bilateral lower extremity swelling for which he used compression garments.  *Id.*  Dr. Vargo also opined that Black would need additional unscheduled rest periods during an 8-hour workday, with 2-3 hours of additional rest time needed on an average day.  *Id*.

Dr. Vargo – September 11, 2017 (mental)

Also, on September 11, 2017, Dr. Vargo completed a Mental Source Statement – Mental Capacity wherein she rated Black's ability to function in various areas.  Tr. 3754-3755.  The available ratings were "none," "mild," "moderate," "marked," and "extreme."  Tr. 3754.

In the area of understanding, remembering and applying information, Dr. Vargo opined that Black had no limitation in seven of the eight areas and a mild limitation in one area.  *Id.*

In the area of interacting with others, Dr. Vargo opined that Black had no limitation in four areas; mild limitations in two areas; and moderate limitations in two areas.  *Id.*

In the area of concentrating, persisting, and maintain pace, Dr. Vargo opined that Black had no limitations in three areas; a mild limitation in one area; moderate limitations in three areas; and a marked limitation in one area (working a full day without needing more than the allotted number or length of rest periods during the day).  Tr. 3755.

In the area of adapting and managing oneself, Dr. Vargo opined that Black had no limitations in five areas and mild limitations in three areas.  *Id.*

At the conclusion of the form, Dr. Vargo indicated that Black had been under the care of her facility since 2009. *Id.* When asked to state the diagnosis and medical and clinical findings that supported her assessment, she stated that "bipolar disorder can lead to social miscues with others." *Id.*

<u>Nurse Lindsey Kershaw, PMHNP-BC – November 27, 2018 (mental)</u>

On November 27, 2018, Nurse Kershaw completed a Mental Source Statement – Mental Capacity wherein she rated Black's ability to function in various areas. Tr. 4936-4937. The available ratings were "none," "mild," "moderate," "marked," and "extreme." Tr. 4936.

In the area of understanding, remembering and applying information, Nurse Kershaw opined that Black had no limitation in one area and mild limitations in the other seven areas. *Id.*

In the area of interacting with others, Nurse Kershaw opined that Black had no limitations in three areas; mild limitations in two areas; and moderate limitations in three areas. *Id.*

In the area of concentrating, persisting, and maintain pace, Nurse Kershaw opined that Black had no limitation in one area; mild limitations in two areas; and moderate limitations in five areas. Tr. 4937.

In the area of adapting and managing oneself, Nurse Kershaw opined that Black had no limitation in one area; mild limitations in two areas; and moderate limitations in five areas. *Id.*

At the conclusion of the form, Nurse Kershaw indicated that Black had been linked with the agency since 2011 and linked with Nurse Kershaw since 2015. *Id.* Nurse Kershaw last saw Black on November 2, 2018. *Id.* When asked to state the diagnosis and medical findings that supported her assessment, Nurse Kershaw stated: "Bipolar disorder unspecified. Client with mood lability who has problems with time management skills with a history of setting multiple

goals with poor completion (i.e. education history)[.]  Client with extreme medical history that causes problems with physical demands of work." *Id.*

Dr Vargo – December 10, 2018 (physical)

On December 10, 2018, Dr. Vargo completed another Medical Source Statement: Patient's Physical Capacity.  Tr. 4941-4942.  Dr. Vargo opined that Black had the following limitations, which she indicated were supported by a finding of spinal stenosis: he could lift and/or carry 5 pounds occasionally and 5 pounds frequently; he could stand/walk for a total of 45 minutes in an 8-hour workday and stand/walk without interruption for 10-15 minutes; he could not climb, kneel, or crawl; he could rarely balance, stoop, or crouch; he could rarely push/pull; he could occasionally reach and perform fine manipulation; and he could frequently perform gross manipulation.  Tr. 4941-4942.  She opined that, due to low back pain, Black could sit for a total of 6-7 hours in an 8-hour workday and without interruption for 1 hour.  Tr. 4941.

Dr. Vargo opined that, due to Black's asthma and bronchitis, he had the following environmental limitations: heights, moving machinery and pulmonary irritants.  Tr. 4942.  Dr. Vargo indicated that Black had been prescribed a cane, TENS unit, and CPAP machine.  *Id.*  Dr. Vargo opined that Black would need to alternate positions between sitting, standing and walking at will.  *Id.*  She indicated that Black experienced severe pain and his pain would interfere with his concentration; cause him to be off task; and cause absenteeism.  *Id.*  Dr. Vargo opined that Black would need to be able to elevate his legs at will at 90 degrees.  *Id.*  Dr. Vargo also opined that Black would need additional unscheduled rest periods during an 8-hour workday, with 3-4 hours of additional rest time needed on an average day.  *Id.*

### *Consultative examiner*

On September 8, 2014, Black saw Dr. Hasan Assaf, M.D., for a consultative internal medicine examination.  Tr. 1014-1026.  On physical examination, Dr. Assaf observed that Black was in no acute distress; he walked with a limp; and he was able to walk on his heels and toes. Tr. 1016.  Dr. Assaf noted that Black used a cane for pain all the time, which was prescribed by Black's doctor and, in Dr. Assaf's opinion, the cane was medically necessary.  Tr. 1016-1017. Black did not need assistance changing for the examination or getting on and off the exam table and he was able to rise from a chair without difficulty.  Tr. 1017.  Straight leg raise test was positive on the left at 40 degrees.  *Id.*  Black's left leg was mildly swollen as compared to the right.  Tr. 1018.  Black exhibited some decreased range of motion with hip flexion.  Tr. 1024. Otherwise, range of motion testing was normal.  Tr. 1022-1024.  There were no sensory deficits in the extremities and strength was 5/5 in all extremities.  Tr. 1017, 1021.

Dr. Assaf listed the following diagnoses – depression and bipolar disorder, by history; low back pain, probably lumbar disc disease; chronic obstructive pulmonary disease; asthma; hepatitis C virus infection, untreated; hypertension; diabetes mellitus; chest pain, cause unknown; left leg swelling, probably related to venous stasis; seizure disorder; and obesity.  *Id.* Dr. Assaf indicated that Black's prognosis was guarded.  *Id.*  Dr. Assaf opined that Black should avoid exposure to dust and other industrial pollutants; Black had marked limitations in activities requiring prolonged standing, walking, bending, and lifting; and Black should avoid driving and operating machinery because of his history of seizures.  *Id.*

### *State agency reviewing consultants*

#### *Psychological*

On initial consideration, on September 2, 2014, state agency psychological consultant Bruce Goldsmith, Ph.D., completed a psychiatric review technique ("PRT").  Tr. 251-252.  In the PRT, Dr. Goldsmith opined that Black had mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation, each of extended duration. Tr. 252.  Dr. Goldsmith concluded that Black's mental impairment was non-severe.  *Id.*  He found that, since the prior ALJ's finding, Black's symptoms had lessened as he continued with treatment and therefore did not adopt the prior ALJ's mental RFC finding.  *Id.*

Upon reconsideration, on December 1, 2014, state agency psychological consultant Vicki Warren, Ph.D., affirmed Dr. Goldsmith's findings.  Tr. 264-265.

#### *Physical*

On initial consideration, September 12, 2014, state agency consultant Dr. Esberdado Villanueva, M.D., found that there was new evidence in the file.  Tr. 253-254.  However, he concluded that the new evidence did not demonstrate significant or material changes from the prior ALJ's RFC finding.  *Id.*  Thus, Dr. Villanueva adopted the ALJ's prior physical RFC finding (Tr. 254), which was: light work except he could only occasionally climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs; occasionally stoop, kneel, crouch, crawl and engage in activities requiring balance; and should avoid concentrated exposure to the operational control of moving machinery and unprotected heights.  Tr. 223, 254.

Upon reconsideration, on November 18, 2014, state agency consultant Dr. Lynn Torello, M.D., affirmed Dr. Villanueva's RFC assessment.  Tr. 266.

## C.    Testimonial evidence

### 1.    Plaintiff's testimony

Black testified and was represented by counsel at the December 12, 2018, hearing.  Tr. 36, 41-75.  Black also testified and was represented at hearings on March 21, 2016 (Tr. 163-204) and January 1, 2018 (Tr. 102-147).

Black was able to drive without restrictions.  Tr. 42-43.  Black was 6'2" and weighed 280 pounds.  Tr. 43.  At one point, Black had weighed 340 pounds but he was able to lose weight with surgery and dietary changes.  Tr. 43.  Following his bariatric surgery, Black had some issues complying with the dietary recommendations but eventually realized that he had to be compliant in order to be healthier.  Tr. 45.  Black's diabetes was better because he had changed his diet.  Tr. 53.  He was managing his diabetes through diet, shots, and checking his sugars.  Tr. 53.  Black was still wearing compression socks for his swelling.  Tr. 53-54.  Sometimes he still has to use wraps but the compression socks help keep the swelling under control.  *Id.*  There are times, however, when his feet swell so much that he is unable to get them into his shoes.  Tr. 54.  For his diabetes, he had been put on Invocada and Victoza in place of his insulin but the Ivocada resulted in masses on his kidneys and liver.  Tr. 45.  He was scheduled to see a doctor about the masses.  Tr. 45.  He had MRIs taken and was hoping that he would not need dialysis.  Tr. 52.

Black did not think that losing weight had helped improve any of his medical conditions.  Tr. 43-44.  He felt that the bilateral spinal injections that he receives for his back pain and the Gabapentin that he takes for his cervical pain helped the most.  Tr. 44, 52.  Black had his last bilateral spinal injection the prior month, on November 15.  Tr. 51.  When Black had that

injection, he was told that his spinal canal was narrowing and he could become paralyzed if it worsened.  Tr. 51.

Black had experienced a stroke in December of the prior year.  Tr. 46-47.  He relayed that he still experienced some effects from the stroke.  Tr. 47.  He explained he gets stuck on words sometimes and sometimes he cannot talk.  *Id.*  He was not sure whether he regained all his strength on his left side.  *Id.*  However, he had completed physical and occupational therapy and was seeing his doctor regularly and felt that his doctor was on top of everything.  *Id.*

Black was pursuing a Bachelor of Science in healthcare management.  Tr. 48.  He started taking online courses in February of that year.  Tr. 47, 48.  They were five-week courses.  Tr. 49.  Black had student loans to cover the cost of the courses.  *Id.*  He explained it passed the time and prevented him from just sitting around worrying about when his social security hearing was going to take place.  Tr. 47.  Since the courses were online, Black was able to do the work at his own pace.  Tr. 47.  For example, if he needed to lie down, he could do that.  Tr. 47-48.  He still had deadlines, however, that he had to meet for his course work.  Tr. 48.  Black was getting As and Bs in his courses.  Tr. 50.  He estimated that each course required about 10 hours of studying per week.  *Id.*  Black anticipated that he would be finished with his courses in April of 2020.  Tr. 51.  Black explained that he was pursuing further education because he did not want to give up on the possibility of employment in the future.  Tr. 48.  Black indicated he was "not really trying to be on Social Security" but had "no other choice[]" at the time.  Tr. 48.

Black was not in any better position than before to help with chores at home.  Tr. 54.  His fiancée still performed the chores around the house.  *Id.*  He noted he was lucky to have her in his life.  *Id.*

2.      **Vocational Expert**

A Vocational Expert ("VE") testified at the December 12, 2018, hearing.  Tr. 76-90.  The

VE described Black's past work as including an automotive parts stocker, a medium, SVP[3] 2 job

that Black performed at the heavy, SVP 3 level; services scheduler, education, a sedentary, SVP

3 job; file clerk, a light, SVP 3 job; packing and shipping clerk, a light, SVP 3 jobs; and quality

control inspector, a light, SVP 4 job that Black performed at the medium level.  Tr. 82-83.

For her first hypothetical, the ALJ asked the VE to assume an individual of Black's age

and with his education and work experience who can perform a full range of light work with the

following additional limitations: can climb ramps and stairs; can occasionally climb ladders,

ropes, and scaffolds; can occasionally stoop, kneel, crouch, and crawl; can occasionally balance;

and should avoid concentrated exposure to the operational control of moving machinery and

unprotected heights.  Tr. 85.  Based on the first hypothetical, the VE indicated that the described

individual could perform Black's past work as file clerk and services scheduler.  Tr. 85-86.  The

VE also indicated that there were other jobs in the light category that the described individual

could perform, including packager, cashier, and assembler of small products (bench assembler).

Tr. 86-87.  The VE provided national job incidence data for the identified jobs.  Tr. 87.

For her second hypothetical, the ALJ asked the VE to assume an individual of Black's

age and with his education and work experience who can perform the full range of sedentary

work with the following additional limitations: can occasionally balance, stoop, kneel, crouch

and crawl; occasionally climb ramps and stairs, never climb ladders, ropes and scaffolds; and

---

[3] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation.
Social Security Ruling No. 00-4p, 2000 WL 1898704, *3 (Dec. 4, 2000).   "Using the skill level definitions in 20
CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP
of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."  *Id.*

should never work in an environment with unprotected heights, moving mechanical parts or work that requires commercial driving. Tr. 87-88. The VE indicated that the described individual would be able to perform Black's past work as a services scheduler. Tr. 88. The VE also indicated that the described individual would be able to perform other jobs in the sedentary category, including food and beverage order clerk, document preparer, and telemarketer. Tr. 88. The VE provided national job incidence data for the identified jobs. Tr. 88-89.

Black's counsel asked the VE to consider the second hypothetical with the following additional limitation: the individual would need to elevate his legs to a 90-degree level throughout the workday on an as-needed basis. Tr. 89. The VE indicated that such a limitation would require an accommodation and there would be no work at the sedentary level. *Id.* In response to further questioning by Black's counsel, the VE indicated that, if an individual was limited to performing simple, routine, and repetitive tasks, the individual would not be able to perform Black's past job as a scheduling clerk. Tr. 89-90.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[4] . . . .

---

[4] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.      If claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[5] claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

---

[5] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 416.925.

## IV. The ALJ's Decision

In her February 28, 2019, decision, the ALJ made the following findings:[6]

1. Black has not engaged in substantial gainful activity since June 30, 2014, the application date.  Tr. 16.

2. Black has the following severe impairments: lumbar degenerative disc disease and epidural lipomatosis; diabetes mellitus, type II; obesity; and chronic lower extremity lymphedema.  Tr. 16.  The record also showed evidence of the following additional impairments that were found to be not severe: cervical radiculopathy, stroke, bipolar disorder, hypertension, hypothyroidism, seizure disorder, left eye loss of visual acuity, migraine headaches, obstructive sleep apnea (OPA), gastroesophageal reflux disease (GERD), a history of hepatitis C infection, depressive disorder, and a history of polysubstance abuse.  Tr. 16-18.

3. Black does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Tr. 18.

4. Black has the RFC to perform light work as defined in 20 C.F.R. § 416.967(b) except he can only occasionally climb ladders, ropes or scaffolds; occasionally climb ramps or stairs and occasionally stoop, kneel, crouch, crawl or engage in activities requiring balance; should avoid concentrated exposure to operational control of moving machinery and unprotected heights.  Tr. 18-23.

5. Black is capable of performing past relevant work as a service scheduler (education) and file clerk. Tr. 23-25.  Although Black can perform his past work, the following alternative findings were made. Tr. 25.  Black was born in 1965 and was 49 years old, which is defined as a younger individual age 18-49, on the date the application was filed; he subsequently changed age category to closely approaching advanced age. *Id.*  Black has at least a high school education and is able to communicate in English. *Id.*  Transferability of job skills is not material to the determination of disability. *Id.* Considering Black's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Black can also perform, including packager, cashier, and bench assembler.  Tr. 25-26.

---

[6] The ALJ's findings are summarized.

Based on the foregoing, the ALJ determined that Black had not been under a disability, as defined in the Social Security Act, since June 30, 2014, the date the application was filed.  Tr. 26.

## V. Plaintiff's Arguments

Black argues that the RFC finding is not supported by substantial evidence because the ALJ's light exertional work finding was error and not sufficiently explained (Doc. 14-1, pp. 27-30); the ALJ erred in finding use of a cane was not obligatory (Doc. 14-1, pp. 30-31); and the ALJ erred by not accounting for Black' need to elevate his legs and take excessive breaks (Doc. 14-1, p. 32).  Black also argues that the ALJ erred in the weight she assigned to the opinions of Dr. Vargo, a treating physician; Dr. Assaf, an examining physician; and Nurse Kershaw, a treating provider.  Doc. 14-1, pp. 32-39.

## VI. Law & Analysis

### A.      Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42

U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence

supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision

"so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v.*

*Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the

case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v.*

*Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.      The ALJ did not err in assessing Black's RFC**

Black argues that the RFC finding is not supported by substantial evidence because the

ALJ's light exertional work finding was error and not sufficiently explained (Doc. 14-1, pp. 27-

30); the ALJ erred in finding use of a cane was not obligatory (Doc. 14-1, pp. 30-31); and the

ALJ erred by not accounting for Black's need to elevate his legs and take excessive breaks (Doc.

14-1, p. 32).

**1.      Light RFC finding**

Black contends that prior ALJs concluded that Black was limited to performing no more

than sedentary work, but the ALJ did not state in her decision why she found Black was limited

to light work as opposed to sedentary work.  Doc. 14-1, p. 28, citing Tr. 279, 305.  The two

decisions that Black references are an April 5, 2016, unfavorable decision wherein Black was

limited to sedentary work (Tr. 270, 279) and a February 8, 2018, unfavorable decision wherein

Black was also limited to sedentary work (Tr. 295, 305).  However, these prior decisions were

remanded by the Appeals Council.  Tr. 290-294 (Appeals Council June 6, 2017, decision

remanding April 5, 2016, decision); Tr. (Appeals Council June 12, 2018, decision remanding

February 8, 2018, decision).  Thus, since they were not final decisions, the ALJ who rendered the

decision presently before this Court was not bound by those prior findings.  *See e.g.*, *Wireman v.*

*Comm'r of Soc. Sec.*, 60 Fed. Appx. 570, 571 (6th Cir. Mar. 19, 2003) ("[A]n ALJ addressing a claimant's subsequent application is bound by the findings of a prior <u>final</u> decision.  In this case, ALJ Cogan's findings did not involve a different application nor a 'final' decision. The only final decision in this case is the March 15, 2000, hearing decision which is now before this court. All other decisions relevant to Wireman's social security disability insurance benefits never became final as they were vacated pursuant to remands for further proceedings.  Therefore, Wireman's contention that the ALJ was bound by the findings of ALJ Cogan is meritless.") (emphasis supplied).

While the two decisions that Black references were not final decisions, the record contains a prior final decision that was considered by the ALJ.  That decision, dated February 22, 2013, related to Black's prior application filed on June 30, 2010, alleging disability beginning on March 27, 2009.  Tr. 13, 215-237.  The Appeals Council denied Black's request for review of that decision on May 20, 2014, making the ALJ's February 22, 2013, the final decision.  Tr. 238-243.  In the prior February 22, 2013, decision, the ALJ concluded that Black had the RFC to perform light work.  Tr. 223.

In *Drummond*, the Sixth Circuit held that, "Absent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ."  *Drummond v. Comm'r*, 126 F.3d 837, 842 (6th Cir. 1997).  More recently the Sixth Circuit explained that, "The key principles protected by *Drummond*—consistency between proceedings and finality with respect to resolved applications . . . do not prevent the agency from giving a fresh look to a new application containing new evidence or satisfying a new regulatory threshold that covers a new period of alleged disability while being mindful of past rulings and the record in prior proceedings."  *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 931 (6th Cir. 2018).  "Fresh review

32

is not blind review. A later administrative law judge may consider what an earlier judge did if for no other reason than to strive for consistent decision making." *Id.* at 934.  Thus, when a claimant has previously filed an application for benefits and an ALJ has rendered a final decision, an ALJ considering a claimant's new application encompassing a different time period may find that the prior ALJ's findings are legitimate and adopt those findings absent new and material evidence. *Earley*, 893 F.3d at 933; *Drummond*, 126 F.3d at 842; AR 98-4(6), *Effect of Prior Findings on Adjudication of a Subsequent Disability Claim Arising Under the Same Title of the Social Security Act -- Titles II and XVI of the Social Security Act*, 1998 WL 283902 (June 1, 1998).

Consistent with these principles, the ALJ considered the prior February 22, 2013, decision and explained that, "[a]lthough there is new evidence regarding physical conditions, it does not change the prior Administrative Law Judge's findings as to physical capacity . . . [and] I adopt the prior Administrative Law Judge's physical residual functional capacity findings[.]"[7] Tr. 13.

Thus, the issue before this Court is not whether the ALJ's decision is consistent with prior non-final decisions but whether the evidence of record supports the ALJ's decision that Black continued to have the physical RFC to perform light exertional work.  With respect to this issue, Black argues that the medical records relating to his low back pain with radiation into his lower extremities and edema, which were worse due to his obesity, support a sedentary as opposed to light exertional RFC.  Doc. 14-1, pp. 28-30.  However, in support of his claim that the ALJ should have found a more restrictive RFC, Black has not argued or shown that the ALJ did not consider the evidence he points to.  For example, the ALJ considered evidence relating to obesity, she found obesity to be a severe impairment, and considered Black's obesity "in relation

---

[7] The AJ found evidence of improvement in Black's mental functioning and did not adopt the prior ALJ's mental RFC findings.  Tr. 13.

to the musculoskeletal, respiratory, and cardiovascular body systems listings[.]" Tr. 16, 18, 21.
The ALJ also found lumbar degenerative disc disease and epidural lipomatosis and chronic lower
extremity lymphedema to be severe impairments. Tr. 16. The ALJ considered evidence
regarding Black's chronic back pain with radiculopathy and lower extremity swelling, including
treatment with Dr. Vargo, Dr. Assaf's examination findings, and MRI imagining results. Tr. 19-
20, 21. In reviewing the record relative to Black's physical impairments, the ALJ found that
Black's treatment was conservative in nature. Tr. 20. For example, his treatment involved
medication, physical therapy, weight loss, compression stockings for lower extremity swelling, a
TENS unit, and steroid injections spaced about one year apart. Tr. 20-21. The ALJ
acknowledged some abnormal examinations findings, such as spinal tenderness, slight limp,
minimally limited range of motion in the hips, limited range of motion in the spine, and positive
straight leg raise. *Id.* However, the ALJ also observed that the record showed normal
examination findings, including 5/5 motor strength; normal gait, sensation and reflexes; ability to
heel and toe walk, full range of motion in extremities; and ability to get on and off an
examination table without assistance. *Id.*

In essence, Black disagrees with the ALJ's finding that his symptoms were not as
disabling as he alleged. However, the ALJ conducted a thorough review of the evidence Black
presented in support of his new application for social security disability, including treatment
records and opinion evidence. Tr. 16-23. Consistent with *Earley*, the ALJ did not simply accept
the prior RFC without considering the evidence. Having conducted a full and fresh review of the
evidence, the ALJ explained that she found that the new evidence did not support a change to the
prior ALJ's RFC finding. Tr. 13. While Black contends that there is substantial evidence to
support his claim that his symptoms are disabling, the ALJ having considered the entirety of the

record, found otherwise. And, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. Furthermore, it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner,* 745 F.2d at 387.

Black also argues that the medical opinions of Dr. Assaf and Dr. Vargo support a sedentary RFC. Doc. 14-1, p. 30. However, an ALJ, not a physician, is responsible for assessing a claimant's RFC. *See* 20 C.F.R. § 416-946(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009). Furthermore, the ALJ assigned little or partial weight to the opinions of Dr. Vargo and Dr. Assaf and, as discussed more fully below, the Court finds that the ALJ did not err in weighing their opinions. Thus, Black's reliance on the opinions of Dr. Vargo and Dr. Assaf to demonstrate that the physical RFC light exertional finding is not supported by substantial evidence is unsuccessful.

For the reasons discussed herein, the Court finds that ALJ's decision makes clear that the ALJ fully considered the record when formulating Black's RFC and Black has not shown that the light exertional RFC finding is unsupported by substantial evidence.

### 2. Need to use a cane

The ALJ acknowledged evidence in the record indicating that Black used a cane and that Dr. Vargo indicated that a cane had been prescribed but the ALJ found that the record did not support a finding that use of a cane was obligatory. Tr. 21, 23. She also found that the record lacked a prescription for the cane. Tr. 21, 23. Black argues that the ALJ erred by finding that Black's use of a cane was not obligatory and should have included the need to use a cane for stability in the RFC. Doc. 14-1, pp. 30-31.

Social Security Ruling 96-9p states the following regarding consideration of hand-held assistive devices:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

SSR 96-9p, 1996 WL 374185, * 7 (July 2, 1996). Black acknowledges that SSR 96-9p requires medical documentation "establishing the need for a hand-held assistive device . . . and describing the circumstances for which it is needed[.]" Doc. 14-1, p. 31 (quoting SSR 96-9p) (emphasis supplied).

Black points to an order for a cane placed by a physical therapist, Barbara Tingley, on June 19, 2014, to support his claim that the ALJ erred with respect to her evaluation of Black's need to use a cane. Doc. 14-1, p. 30 (citing Tr. 821). While a cane was ordered to assist with ambulation (Tr. 819), the order does not clearly set forth the circumstances for which a cane was required, i.e., whether all the time, periodically, or only in certain instances. And, as noted by the ALJ, Black did not always use his cane. Tr. 21, 23 (citing Exhibit B28F/22 (Tr. 4927), November 15, 2018, treatment note, "Patient noted to have normal gait without assistance.").

In support of his claim that the ALJ should have included the need to use a cane in the RFC, Black also points to treatment notes showing that he used a cane when seeing medical providers and he points out various abnormal examination findings, e.g., trace lower extremity reflexes, slow gait, lower extremity swelling, edema left foot/leg. Doc. 14-1, pp. 30-31. However, the ALJ did not ignore evidence regarding Black's use of cane. *See e.g.*, Tr. 20 ("Dr.

Assaf found the claimant was using a cane to ambulate and walked with a slight limp."); Tr. 21

("His gait was within normal limits, although he was using a straight cane.").  And, the ALJ did

not ignore abnormal examination findings.  Tr. 20 ("Dr. Vargo recommended continued

conservative treatment, including medication, weight loss, and compression socks for his lower

extremity swelling."); Tr. 20 ("Dr. Vargo noted that the improvement in swelling had allowed

the claimant to stop taping his leg."); (Tr. "[H]e still showed pitting edema in his left leg, but the

claimant denied any pain."); Tr. 21 ("His gait was slow with a cane.").  Furthermore, the ALJ did

not fail to evaluate that evidence.  For example, the ALJ acknowledged that, while "Dr. Assaf

noted that the cane was medically necessary[,]" he also reported normal examination findings,

including Black's ability to get on and off the examination table without assistance, no spinal

scoliosis or kyphosis; no muscle spasms or atrophy; no joint swelling, effusion or instability; full

range of motion in all extremities with 5/5 motor strength; and normal sensation and reflexes.

Tr. 20.  Further, there is evidence indicating that Black did not always use a cane.  For example,

as the ALJ noted, "[o]n November 15, 2018, Black had a normal gait without assistance."  Tr. 23

(citing Exhibit B28F/22 (Tr. 4927), November 15, 2018, treatment note, stating "Patient noted to

have normal gait without assistance.").  Also, the ALJ found that there was no prescription for a

cane.  Tr. 23.  And, although Dr. Vargo indicated that a cane had been prescribed and, while

Black points to a 2014 physical therapy order for a cane, there is no medical documentation

indicating that a cane is obligatory or required in all circumstances.

Moreover, evidence that a claimant uses "'a cane at various times,' does not mean [an]

ALJ [is] required to include it in [the claimant's] RFC."  *Lewandowski v. Berryhill*, 2019 WL

480644, * 15 (N.D. Ohio Feb. 7, 2019) (quoting *Forester v. Comm'r of Soc. Sec.*, 2017 WL

4769006, * 4 (S.D. Ohio Oct. 23, 2017) and citing *Grimes v. Berryhill¸* 2018 WL 2305723, * 7

(E.D. Tenn. April 19, 2018).   Thus, the fact that there is evidence that Black reported using a cane and/or that medical records include a record of a cane being used did not require the ALJ to include the need to use a cane in the RFC assessment.  Additionally, "[w]here there is conflicting evidence concerning the need for a cane, 'it is the ALJ's task, and not the Court's, to resolve the conflicts in the evidence.'"  *Forester*, 2017 WL 4769006, * 4 (quoting *Foreman v. Comm'r of Soc. Sec.*, 2012 WL 1106257, * 4 (S.D. Ohio Mar. 31, 2012)).

As indicated herein, the ALJ considered and weighed evidence relating to Black's use of, and need to use, a cane.  In doing so, the ALJ concluded that the evidence did not support inclusion of a limitation in the RFC for use of a cane.  Here, the ALJ did not ignore evidence.  Rather, he considered and weighed the evidence.   And, it is not this Court's role to resolve conflicts in the evidence, including conflicts in evidence pertaining to Black's need to use a cane.  *Id.*; *see also Garner*, 745 F.2d at 387 (A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility.").

Considering the foregoing, the Court finds that Black has not shown that the ALJ erred in evaluating evidence regarding his use of a cane.  Moreover, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.  Here, there is substantial evidence to support the ALJ's RFC that does not include the need to use a cane.  Thus, even if there is evidence to support Black's position, reversal and remand is not warranted.

### 3.      Need to elevate legs

Relying on Dr. Vargo's opinion that Black would need to elevate his legs to 90 degrees and evidence of the need for compression stockings, wrapping of the legs to keep the edema

decreased, and physical therapy for his leg swelling, Black argues that the ALJ erred by not accounting for Black's need to elevate his legs and take excessive breaks.  Doc. 14-1, p. 32. However, as discussed above, the ALJ considered evidence relating to Black's leg swelling and edema and found that it was not necessary to include limitations for elevation of the legs or excessive breaks.  The Court will not engage in reweighing the evidence considered by the ALJ. Furthermore, the ALJ considered Dr. Vargo's opinions and found that they were entitled to little or partial weight.  And, as discussed below, the Court finds no error with respect to the ALJ's weighing of the opinion evidence, including Dr. Vargo's opinions.

For these reasons, the Court finds that the ALJ did not err by not including in the RFC a limitation for elevation of legs to 90 degrees and/or the need for excessive breaks.

## C.    The ALJ did not err with respect to her consideration or weighing of the medical opinion evidence

Black also argues that the ALJ erred in the weight she assigned to the opinions of Dr. Vargo, a treating physician; Dr. Assaf, an examining physician; and Nurse Kershaw, a treating provider.  Doc. 14-1, pp. 32-39.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for the weight he assigns to the opinion.  *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544; *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011).  In deciding the

weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 416.927(c).

An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions. *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011). The "procedural 'good reasons' rule serves both to ensure the adequacy of review and to permit the claimant to understand the disposition of [her] case." *Miller v. Berryhill*, 2018 WL 3043297, * 7 (E.D.Mich., May 29, 2018) (quoting *Friend v. Comm'r of Soc. Sec.*, 375 Fed.Appx. 543, 550-51 (6th Cir. 2010)), *report and recommendation adopted*, 2018 WL 3036340 (June 19, 2018).

For claims like Black's that are filed prior to March 27, 2017, the regulations define a "treating source" as a claimant's "own acceptable medical source" who "provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. §416.927(a)(2). Thus, where there is no ongoing treatment relationship, an opinion is not entitled to deference or controlling weight under the treating physician rule. *See Kornecky v. Comm'r of Soc. Sec*, 167 Fed. Appx. 496, 508 (6th Cir. 2006); *Daniels v. Comm'r of Soc. Sec.,* 152 Fed. Appx. 485, 490 (6th Cir. 2005).

Under the regulations in effect for claims filed prior to March 27, 2017, "acceptable medical source" includes licensed physician, licensed psychologist, licensed optometrist but does

not include licensed advanced practice registered nurse or social worker. 20 C.F.R. § 416.902(a). Thus, since an "acceptable medical source" is not considered a "treating source," a nurse's opinion is not subject to controlling weight analysis under the treating physician rule. *See e.g., Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997) (treating chiropractor was an "other source," not an "acceptable medical source" within meaning of regulation, thus ALJ has discretion to determine appropriate weight to accord chiropractor's opinion based on all evidence in record).

### 1. Dr. Vargo

Consistent with the treating physician rule, the ALJ considered and explained the weight assigned to Dr. Vargo's opinions, stating:

> Dr. Vargo, completed several forms regarding the claimant. She has been treating the claimant since 2010. Initially, Dr. Vargo submitted a statement indicating that the claimant is permanently disabled and unable to work (Exhibits B10F). This statement addresses the ultimate issue of disability, which is explicitly reserved to the Commissioner under the rules and regulations of the Social Security Administration (20 CFR 416.927(d)). I therefore give this opinion little weight.

> Dr. Vargo also submitted additional assessments of the claimant's mental and physical limitations dated September 11, 2017. In her physical assessment, Dr. Vargo opined that the claimant could frequently lift five pounds or less, stand and walk for 2-3 hours in a six-hour workday, but not for more than 15-20 minutes at a time, and never perform postural activities. She also recommended additional environmental and manipulative limitations and concluded that the claimant would be expected to have moderate interference with concentration due to pain. Furthermore, Dr. Vargo stated that the claimant needs the ability to elevate his legs at will and requires excessive rest breaks throughout the workday (Exhibits Bl6F). Although Dr. Vargo has a long standing treatment relationship with the claimant, her opinion about the claimant's physical abilities is grossly inconsistent with her own examination findings, which show the claimant has only mild spinal tenderness and mildly limited range of motion, with 5/5 motor strength throughout and normal gait, sensation, and reflexes (Exhibits B19F, pp. 166-172). Dr. Vargo's opinion is also inconsistent with the examination findings of Dr. Assaf and the medical record as a whole (Exhibits B4F). Therefore, I give this opinion partial weight. Her mental assessment stated that the claimant has mild limitations understanding, remembering, and carrying out tasks, moderate limitations interacting with others, moderate to marked limitations concentrating, persisting,

or maintaining pace, and mild limitations adapting or managing himself (Exhibits Bl 7F). I give this opinion little weight. I note that Dr. Vargo is not a qualified mental health specialist.  Her opinion regarding the claimant's mental limitations is also grossly inconsistent with the claimant's psychiatric treatment notes and Dr. Vargo's own examination findings, which show the claimant is psychologically stable (Exhibits B18F, p. 353 and B19F, p. 171).

\*\*\*

Dr. Vargo completed a medical source statement regarding claimant's physical capacity on December 10, 2018. Dr. Vargo opined that the claimant could occasionally and frequently lift five pounds or less, stand and walk for 45 minutes total in an 8-hour day, and sit for 6-7 hours in an 8-hour day.  He can never perform postural activities.  She also recommended additional environmental and manipulative limitations.  She concluded that pain would interfere with concentration, take the claimant off task[] and cause absenteeism.   Furthermore, Dr. Vargo stated that the claimant needs the ability to elevate his legs at will and requires excessive rest breaks throughout the workday.  She based these limits on low back pain and spinal stenosis.  She also wrote that claimant had been prescribed a cane, TENS Unit and Cpap machine.  (Case documents, submitted 12/12/18).   I give this opinion little weight.  It is inconsistent with the treating records.  At the most recent visits in the record in August 2018, claimant's coordination was grossly intact.  Claimant showed excellent flexion of the lumbar spine.  His gait was slow with a cane (Exhibit B25F/21).  Claimant's back pain was 3/10 (Exhibit B25F/16), which should not cause such significant limitations. However, as noted above, claimant used a cane but it is not obligatory and the record lacks a prescription for the cane.  On November 15, 2018, claimant had a normal gait without assistance (Exhibit B28F/22).

Tr. 22-23.

The ALJ did not ignore Dr. Vargo's opinions and, contrary to Black's contention (Doc. 14-1, p. 36), the ALJ did consider the long-term treatment relationship that Dr. Vargo had with Black.  *See* Tr. 22 ("Although Dr. Vargo has a long standing treatment relationship with the claimant . . .").

Black does not raise a challenge to the weight the ALJ assigned to Dr. Vargo's mental capacity opinion.  And, Black acknowledges that Dr. Vargo's opinion that Black was permanently disabled and unable to work is an issue reserved to the ALJ.  However, Black argues that the balance of Dr. Vargo's opinions deserved great weight.  Doc. 14-1, p. 35.  He

challenges the ALJ's finding that Dr. Vargo's opinions were inconsistent with her own examination findings, the findings of Dr. Assaf and the medical record as a whole.  He contends that there is evidence of trace lower extremity reflexes, slow gait, swelling of lower extremities and decreased vibratory sensation bilaterally, and decreased absence of hair growth and edema of the left foot/leg.  Doc. 14-1, pp. 35-36.  Black also argues that, contrary to the ALJ's statement that the record lacked evidence of a prescription for a cane, Black's physical therapist prescribed a cane.  Doc. 14-1, p. 36.  As discussed above, while there is an order for a cane in June 2014, there is no medical documentation indicating that a cane is obligatory or required in all circumstances.  Also, the ALJ thoroughly considered the voluminous record and weighed the evidence and it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner,* 745 F.2d at 387.  Furthermore, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.

Here, the ALJ pointed to specific examination findings that she found were inconsistent with Dr. Vargo's opinions, including Dr. Vargo's most recent August 2018 examination.  Tr. 22, 23.  Also, even if Dr. Vargo's and Dr. Assaf's ultimate opinions are consistent with each other, the ALJ discounted Dr. Vargo's opinion, in part, because it was inconsistent with Dr. Assaf's underline examination findings which included 5/5 motor strength throughout and normal range of motion in the extremities and normal sensation.  Tr. 20, 22.  Having considered the record as a whole, the ALJ assigned partial or little weight to Dr. Vargo's opinions and Black has not shown that the ALJ's findings are unsupported by substantial evidence.

For the reasons explained, the Court finds that the ALJ did not err in weighing Dr.

Vargo's opinions.

### 2.  Dr. Assaf

Black challenges the ALJ's decision to assign little weight to the opinion of consultative

examining physician Dr. Assaf.  Doc. 14-1, pp. 36-37.  As a one-time examining physician, Dr.

Assaf's opinion is not entitled to deference or controlling weight under the treating physician

rule.  *See Kornecky*, *supra*; *Daniels*, *supra*.  Nevertheless, consistent with the regulations, the

ALJ considered and weighed Dr. Assaf's consultative opinion, stating:

> I give little weight to the opinion of Dr. Assaf. Dr. Assaf is an independent
> consultant and an examining source, but he only saw the claimant one time. Dr.
> Assaf opined that the claimant's prognosis was guarded. He also stated that the
> claimant has marked limitations performing prolonged standing, walking, bending,
> and lifting, and should avoid driving and operating machinery (Exhibits B4F, p. 5).
> Dr. Assafs opinion is grossly inconsistent with his own examination findings,
> which show 5/5 motor strength throughout with normal range of motion and
> sensation. Dr. Assaf s opinion is also grossly inconsistent with Dr. Vargo's recent
> treatment notes (Exhibits Bl9F, pp. 166-172).  Dr. Assaf apparently relied quite
> heavily on the subjective report of symptoms and limitations provided by the
> claimant, and seemed to uncritically accept as true most, if not all, of what the
> claimant reported. Yet, as explained elsewhere in this decision, there exist good
> reasons for questioning the consistency of the claimant's subjective complaints.
> Consequently, I give little weight to the opinion of Dr. Assaf.

Tr. 37.

In weighing Dr. Assaf's opinion, the ALJ properly considered the nature and extent of the

treatment/examining relationship, i.e., one-time examining physician, and the consistency of the

marked limitations with the evidence of record, including Dr. Assaf's own examination findings.

*See* 20 C.F.R. § 416.927(c)(1),(2) and (4).  Black argues that, in addition to the examination

findings noted by the ALJ when weighing Dr. Assaf's opinion, Dr. Assaf's examination also

revealed that Black's left leg was mildly swollen as compared to the right.   Doc. 14-1, p. 37.

Further, Black argues that, "[w]ith the swelling of [Black's] legs and his weight alone, Dr. Assaf

had a sound basis for his opinions." *Id.*  Here, again, Black seeks to have this Court weigh

evidence that the ALJ considered.  The ALJ noted that Dr. Assaf's examination findings

included a finding that Black's left leg was mildly swollen.  Tr. 20.  Also, throughout the

decision, the ALJ noted and discussed Black's obesity.  *See e.g.*, Tr. 21.  While Black disagrees

with the ALJ's decision to assign little weight to Dr. Assaf's opinion, Black has failed to show

that the ALJ's decision to do so is not supported by substantial evidence.

Black also takes issue with the ALJ's finding that it appears that Dr. Assaf relied quite

heavily on subjective reports from Black and argues that, if the ALJ had concerns regarding Dr.

Assaf's opinion, the ALJ could have sought additional evidence or examinations or called a

medical expert to testify.  In weighing opinions, an ALJ may consider any other factors that tend

to support or contradict the opinion.  20 C.F.R. § 416.927(c)(6).  Thus, it was not improper for

the ALJ to take into account whether the opinions were based on subjective versus objective

findings and reports.  Moreover, Black has not shown that the ALJ determined that Dr. Assaf's

opinion was unclear and it is within the ALJ's discretion "to determine whether additional

evidence is necessary."  *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010).

The ALJ concluded that Dr. Assaf's opinion was entitled to little weight and explained

her reasons.  Black has not shown that those reasons are not supported by substantial evidence or

that the ALJ erred by not seeking additional evidence or testimony.  Therefore, the Court finds

that the ALJ did not err in weighing Dr. Assaf's opinion.

### 3.  Nurse Kershaw

Black argues that, because the ALJ assigned partial weight to the opinion of Nurse

Kershaw, a mental health provider, the ALJ was obligated to include mental health limitations in

the RFC.  Doc. 14-1, pp. 38-39.  As discussed above, under the regulations in effect for claims

filed prior to March 27, 2017, a nurse is not considered a "treating source" subject to controlling

weight analysis under the treating physician rule.  Nevertheless, the ALJ considered and weighed

Nurse Kershaw's opinion and, as indicated by Black, the ALJ assigned her opinion partial

weight, stating:

> Lindsey Kershaw, PMHNP-BC, completed a mental capacity form on November 27, 2018.  She had been linked with the claimant since October 15, 2015.  She wrote that claimant has bipolar disorder with mood lability.  He has problems with time management with a history of setting multiple goa[l]s with poor completion (education history).  She also wrote that claimant has an extensive medical history that causes problems with physical demands of work (Exhibit B29F, p. 2).  As to eight abilities in understanding, remembering, or applying information, claimant has no limit in one ability and mild limits in the remaining seven abilities.   As to eight abilities in interacting with others, claimant has no limitation in three abilities, mild limitation in two abilities and moderate limitations in three abilities.  As to eight abilities in concentrating, persisting, or maintaining pace, claimant has no limitations in one ability, mild limitation in two abilities and moderate limitations in five abilities. As to eight abilities no limitation in adapting or managing oneself, claimant [has] no limitations in one ability, mild limitation in two abilities and moderate limitations in five abilities (Exhibit B29F, pp. 1-2).  I give opinion partial weight.  Treating notes generally show good mental functioning (Exhibit B18F, B21F, B27F).  Claimant is attending an online school and other activities of daily living are inconsistent with this assessment.  In addition, Ms. Kershaw also cites problems with the physical demands of work, which is outside her area of expertise.

Tr. 23.

The ALJ, not a physician or other medical source, is responsible for assessing a

claimant's RFC.  *See* 20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149,

157 (6th Cir. 2009).  When assessing a claimant's RFC, an ALJ "is not required to recite the

medical opinion of a physician verbatim in his residual functional capacity finding . . . [and] an

ALJ does not improperly assume the role of a medical expert by assessing the medical and

nonmedical evidence before rendering a residual functional capacity finding." *Id.*  And, "[e]ven

where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a

state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency

psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 Fed. Appx. 267, 275 (6th Cir. 2015) (unpublished); *see also Moore v. Comm'r of Soc. Sec.*, 2013 WL 6283681, * 7-8 (N.D. Ohio Dec. 4, 2013) (even though the ALJ did not incorporate into the RFC all limitations from a consultative examiner's opinion that the ALJ assigned great weight to, the ALJ's decision was not procedurally inadequate nor unsupported by substantial evidence).

As detailed by the ALJ, Nurse Kershaw found no or mild limitations in some areas and moderate limitations in others.  Tr. 23.  When assigning partial weight to Nurse Kershaw's opinion, the ALJ explained that, "Treating notes generally show good mental functioning. Claimant is attending an online school and other activities of daily living are inconsistent with this assessment."  Tr. 23 (citations omitted).  Black has not shown that the assignment of partial weight to the opinion obligated the ALJ to include mental limitations in the RFC.  Indeed, as indicated above, even where great weight is assigned to an opinion, an ALJ is not required to adopt that opinion wholesale.

Moreover, as the ALJ made clear in her decision, she found that the evidence supported a finding of no more than mild limitation in Black's mental functional abilities and, therefore, concluded that Black's alleged mental impairments were non-severe.  Tr. 17-18.  In doing so, the ALJ relied upon and assigned great weight to the opinions of the state agency psychological consultants, finding that Black's mental impairments were non-severe.  Tr. 18, 252, 264-265. Black does not directly challenge the ALJ's Step Two finding.  Furthermore, assigning partial weight to Nurse Kershaw's opinion, which included findings of both no and mild limitations in multiple functional abilities, is not inconsistent with the ALJ's Step Two finding.

Considering the foregoing, the Court finds that, although the ALJ assigned partial weight to Nurse Kershaw's opinion, the ALJ was not required to adopt her opinion verbatim nor has Black shown that the ALJ was required to include mental limitations in the RFC.

## VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated: February 3, 2021

*/s/ Kathleen B. Burke*

Kathleen B. Burke
United States Magistrate Judge